### 52533. ARGONAUT INSURANCE COMPANY v. C & S BANK OF TIFTON et al.

WEBB, Judge.

There seems to be no dispute about the material facts in this case. Castle Construction Company as general contractor had contracts with Delco-Remy Division, General Motors Corporation, for the construction in Fitzgerald of an office and battery manufacturing plant and also a waste treatment facility for slightly more than $3,000,000 each. Castle subcontracted with Southeastern Electric Contractors, Inc. (SECO) to complete the electrical system in the two construction projects for $679,500 and $295,000, respectively. Argonaut wrote performance and payment bonds on SECO in favor of Castle when the subcontracts were made on January 8 and June 4, 1974, for the respective amounts involved. SECO began with the work called for in the two subcontracts.

On January 28, 1975 Argonaut and Castle were notified by U. S. Steel that SECO owed $20,000 for materials furnished for the battery plant, the last of such having been supplied on October 23, 1974. With past due accounts totaling $906,618 SECO on February 20, 1975 made an "Agreement of Sale" with Gibson Electric, Inc. by which SECO sold to Gibson assets and contracts yet to be performed in return for the guarantee by Gibson and Dynalectron Corporation of payment of a loan of $300,000 to SECO from C & S Bank of Tifton. Gibson was to receive two-thirds of the profits from certain new contracts, and SECO's one-third was to be held in escrow for payment to Gibson in the event SECO defaulted on the bank loan. Eight days thereafter the closing of the loan was completed, and SECO assigned to C & S Bank as part of the security for the loan some nine contract retentions,

including those contract retainages for work performed or to be performed by SECO for Castle. A financing statement to Gibson covering all assets including accounts receivable, which stemmed from the February 20 agreement, was filed by Gibson on March 18.

SECO's subcontracts with Castle provided: "Subcontractors shall not sublet, assign or transfer this subcontract, or any part thereof, without the written consent of contractor." Article XVI(a). The contracts provided for the accumulation of contract retainages by the general contractor's withholding 10% each pay period from the payment request submitted by the sub-contractor.[1]

Castle was first notified of the assignments on March 24, and Argonaut learned about the C & S loan and assignment on or about March 31. Castle never gave written consent to the purported assignment to C & S Bank. The record does not disclose what SECO did with the $300,000 loan proceeds.

On June 17, almost three months later, SECO notified Argonaut in writing that it was unable to proceed further on any of the jobs for which Argonaut had furnished performance and payment bonds. Argonaut as surety on the bonds thereupon discussed with Castle arrangements for completion of the two projects.

C & S Bank, Gibson and Dynalectron instituted this action against Argonaut, Castle and other contractors[2] for recovery of the contract retainages and contract

---

[1] Each subcontract of Castle with SECO provides "Contractor may, at his option, retain 10% of each estimate until final payment and may withhold payment of any estimate until Subcontractor has furnished Contractor with suitable evidence that he has paid in full for all labor, materials and supplies used in the work through the date of the estimate . . . Contractor may deduct from such final payment any sums due to Contractor from Subcontractor under this subcontract or otherwise." Article XII.

[2] SECO found refuge in bankruptcy, and is not a party to this action.

payables held by Castle, contending their priority existed by virtue of duly filed financing statements. The Bank and Gibson obtained on July 10, 1975, an ex parte temporary order against Castle and Argonaut restraining Castle from disbursing or disposing of any retainages or contract balances then held by them for the account of SECO. Castle thereby could not pay off SECO's job obligations. This restraining order was continued in effect and an interlocutory injunction was granted. Castle did complete the remaining electrical work on the two projects, however, and with the trial court's acquiescence charged the money so expended against the unexpended contract balances.

Because Castle was restrained from paying unpaid suppliers and subcontractors of SECO, liens were filed against Delco-Remy's projects. Argonaut, pursuant to the payment and performance bonds it had provided to Castle, satisfied these claims in excess of $340,000.

Both the bank and Gibson as plaintiffs and Argonaut as defendant moved for summary judgment on the issue of who was entitled to the monies.

C & S and Gibson contended that the procedure under the Uniform Commercial Code for protecting security interests is applicable to their assignments and to the surety on the performance and payment bond, and that since the bank and Gibson perfected their security interests under the Code, and Argonaut did not, their rights to the fund withheld by Castle are superior to the rights of Argonaut as surety.

Argonaut contended that by statute and by subrogation its rights are superior to those of C & S and Gibson, and its failure to file under the Code does not affect those rights.

The learned trial judge granted C & S and Gibson's motions, and denied Argonaut's, on the issue of liability and priority only as to the funds in question, asserting that the issue of priority under Georgia law is the major, if not the only, contested issue in the case. The trial court ruled that C & S and Gibson each had perfected its security interest in contract retentions and contract balance by recording their respective security interests in the county (Fulton) of the home office of SECO; that

Argonaut had failed to perfect its security interest; that C & S has a right to the contract retentions superior to the rights asserted by Gibson and Argonaut; that Gibson has a right to the contract retentions subordinate to the right asserted by C & S but superior to the right asserted by Argonaut; that Gibson has a right to contract balances superior to Argonaut; that Argonaut is not entitled to subrogation to any rights of Castle, "but only to the rights of SECO and [those] of materialmen and laborers whose claims [and liens were] satisfied by Argonaut since Argonaut has paid as primary obligor and has paid no item ripe for payment by Castle."

Thus we have the issue on appeal, whether the surety on the subcontractor's bond, by virtue of its subrogation, or the bank and the subcontractor's note endorser, by virtue of having filed financing statements, had superior rights to the funds withheld by the prime contractor.

Subrogation is a legal as well as an equitable right. *Hull v. Myers,* 90 Ga. 674, 682 (16 SE 653) (1892). "Subrogation is the substitution of another person in the place of the creditor . . . It is of equitable origin . . . and its object is the prevention of injustice. The courts incline rather to extend than restrict the principle . . ." *Cornelia Bank v. First Nat. Bank of Quitman,* 170 Ga. 747 (1, 2) (154 SE 234) (1930); *Southern R. Co. v. Overnite Transp. Co.,* 223 Ga. 825, 830 (158 SE2d 387) (1967).

In *Fulton Nat. Bank v. Fulton County,* 144 Ga. 691, 693 (87 SE 1023) (1916), ante UCC, a contractor provided a bond to the owner, during performance borrowed money from the bank for use in the work, defaulted in its performance of the construction contract, and the surety had to complete the project. The court ruled for the surety, holding: "1. The assignment to the bank by the contractor of amounts alleged to be due under the contract was subject to the terms of the contract between the county and the contractor, with notice of which the assignee was chargeable. 2. Under the contract the county might have completed the work itself; and had it done so, the contractor would not have been entitled to receive any further payments until the work was wholly finished, and then only if the balance to be paid under the contract

should exceed the expense incurred by the county for finishing the work. If the expense should be more than such unpaid balance, the contractor would be liable to the county for the difference. (a) Where instead of itself completing the work the county permitted the surety on the contractor's bond to do so, which was done at a necessary expense exceeding the balance of the contract price after deducting payments made to the contractor before default, and including the sums sought to be recovered in this suit, such surety became subrogated as to the right which the county would have had to the balance of the contract price had it completed the work itself; and where such balance was paid by the county to the surety, its right thereto was superior to the claim of the assignee of the contractor before his failure. Title Guaranty Co. v. Dutcher, 203 Fed. 169; First National Bank v. City Trust etc. Co., 114 Fed. 529 (52 C. C. A. 313); Henningsen v. United States Fidelity etc. Co., 143 Fed. 812, s. c. 208 U. S. 404 (28 Sup. Ct. 389, 52 L. ed. 547); Prairie State Bank v. U. S., 164 U. S. 227 (17 Sup. Ct. 142, 41 L. ed. 412)." Certainly the assignee has no more rights under the contract than the assignor would have in dealings with the other contracting party. *Algernon Blair, Inc. v. National Surety Corp.,* 222 Ga. 672, 673 (151 SE2d 724) (1966).

"A surety who has paid the debt of his principal shall be subrogated, both at law and in equity, to all the rights of the creditor, and, in controversy with other creditors, shall rank in dignity the same as the creditor whose claim he paid." Code Ann. § 103-501. "A surety who has paid the debt of his principal shall be entitled also to be substituted in place of the creditor as to all securities held by him for the payment of the debt." Code Ann. § 103-502. Subrogation is not founded upon contract, express or implied, but upon principles of equity and justice. The doctrine was not limited or abrogated by the statutes, but positively reaffirmed.

Was this equitable doctrine of subrogation modified or affected by the Uniform Commercial Code? The precise issue raised herein seems to be of first impression in our state. It has, however, been presented and passed upon in other jurisdictions, and, mindful of the stated policy of the

UCC (Code Ann. § 109A-1—102 (2, c)) to make the law uniform among the various jurisdictions, we note that the overwhelming weight of case authority supports the conclusion that a surety's subrogation rights exist independently of Title 9 filing.[3] No judicial authority to the contrary has come to our attention.

We agree that "There is no reason to assume that the provisions of Article 9, are applicable to the suretyship

---

[3] See, e.g., In re J. V. Gleason Co., 452 F2d 1219, 1221 (8th Cir. 1971) (applying Minnesota law); Home Indemnity Co. v. U. S., 433 F2d 764 (Ct. Cl. 1970) (Illinois); Framingham Trust Co. v. Gould-National Batteries, 427 F2d 856 (1st Cir. 1970) (Massachusetts); Natl. Shawmut Bank v. New Amsterdam Cas. Co., 411 F2d 843 (1st CCA 1969); American Fire & Cas. Co. v. First Natl. City Bank, 411 F2d 755 (1st Cir., 1969) (Puerto Rico); McAtee v. U.S.F. & G. Co., 401 FSupp. 11, 14 (4) (ND Fla. 1975); U. S. F. & G. Co. v. First State Bank of Salina, 208 Kan. 738 (494 P2d 1149) (1972); National Surety Corp. v. State Nat. Bk. of Frankfort, 454 SW2d 354, 356 (Ky. 1970); French Lumber Co. v. Commercial Realty & Finance Co., 346 Mass. 716 (195 NE2d 507) (1964); Canter v. Schlager, 358 Mass. 789 (267 NE2d 492) (1971); Finance Co. of America v. U. S. F. & G. Co., 277 Md. 177 (353 A2d 249) (1976); Mid-Continent Cas. Co. v. First Natl. Bk. & Tr. Co., 531 P2d 1370 (Okla. 1975); Jacobs v. Northeastern Corp., 416 Pa. 417 (206 A2d 49), 11 ALR3d 1220 (1965); First State Bk. v. Reorganized School Dist. R-3, 495 SW2d 471 (Mo. App. 1973); Stevlee Factors, Inc. v. State, 136 N. J. Super. 461 (346 A2d 624) (1975); Aetna Cas. & Sur. Co. v. Perrotta, 62 Misc.2d 252 (308 NYS2d 613) (1970).

The opinion in Canter v. Schlager, supra, was written for the Supreme Judicial Court of Massachusetts by Justice Braucher, former Harvard Law School Professor, who perhaps had a longer and deeper association with the UCC than almost any other individual, and is certainly as knowledgeable as any scholar on the development, enactment, and purposes of the Code.

situation. The surety's position is quite different than that of the commercial lender, who is obviously the primary target of Article 9 . . . 'This unique accumulation of subrogation rights serves to induce a function that is neither ordinary insurance nor ordinary financing . . . Neither is the business one of ordinary financing, for while the surety extends its credit to the owner . . ., as the ultimate guarantee that the job will be done, this is a credit that may either never have to be drawn upon or, if it is drawn upon at all, will in all likelihood be overdrawn.' [Natl. Shawmut Bank v. New Amsterdam Cas. Co., supra, 411 F2d at 845]." In re J. V. Gleason Co., supra, 452 F2d at 1222.

Paraphrasing Professor Corbin on Legal Effects of Assignment [4 Corbin on Contracts, § 901 at p. 609], Castle as primary contractor is both an obligor and an obligee. Its duty is accompanied by a right to the performance of the contract in exchange for its money, and its duty to pay does not in fact arise until performance of the contract by SECO. C & S Bank's rights under its assignment from SECO are also conditioned upon performance of the contract. However, if Argonaut as surety does stand subrogated to the right of Castle in relation to the funds withheld by Castle, it is clear that Argonaut as surety, not C & S Bank, is entitled to the funds. This is so because when SECO had not performed its part of the bargain SECO had no right to payment by Castle and SECO's assignee (Bank) had none. Insofar as the bargain had been performed at Argonaut's expense, under compulsion of the obligation of its bond, it would seem fair and just to give Argonaut that part of the payment still in the hands of Castle that stands dedicated to the fulfillment of the bargain; and it would seem patently unjust to let either SECO or its assignee (Bank) profit by the performance rendered by Argonaut under compulsion of its obligation. This is the essence of the doctrine by which a performing surety may claim subrogation to the creditor's rights. The doctrine rests on the premise that although Castle as prime contractor is a debtor (obligor) as to the promised payments, it is also a creditor (obligee) as to full performance by the subcontractor SECO, and hence deferred contract

payments still in the hands of Castle stand impressed by operation of the subrogation doctrine with a superior equity in favor of the surety's discharging the subcontractor's duty of performance under compulsion. See Mid-Continent, supra, 531 P2d at pp. 1375, 1376.

The Court of Appeals of Maryland, in Finance Co. of America v. U. S. F. & G. Co., supra, 353 A2d at p. 252, expressed it thusly: "The general rule with respect to the right of the surety of a building or construction contractor, who completes the contract upon the contractor's default, to monies in the hands of the contractee-obligee, earned by the contractor before default, is that upon completion of the contract the surety is entitled to be subrogated to the rights which the contractee-obligee had to, or could assert against, such funds upon the contractor's default, to the extent necessary to reimburse himself for the outlay made to complete the contract."[4] See also 17 AmJur2d, Contractors' Bonds, §§ 42, 107, 111. The surety, in a sense, is "secured" by its right of subrogation, which relates back to the issuance of the bond to defeat intervening creditors. Pearlman v. Reliance Ins. Co., 371 U. S. 132 (83 SC 232, 9 LE2d 190) (1962); Industrial Bank of Washington v. United States, 424 F2d 932 ( D. C. CC 1970); Western Casualty & Surety Co. v. Brooks, 362 F2d 486 (4 CCA 1966); Canter v. Schlager, supra, (Mass.) 267 NE2d 492 (1, 4).

---

[4] Chief Judge Murphy, speaking for the Maryland Court at p. 253, continued: "That it was not the intent of the UCC to impair the surety's equitable right of subrogation, or to make it subject to the filing provisions of Title 9, is similarly manifest from the Code's history. Proposed § 9-312 (7) of the 1952 Official Draft would have provided that '[a] security interest which secures an obligation to reimburse a surety . . . secondarily obligated to complete performance is subordinate' to a later lender. The draftsmen deleted the section in 1953, explaining that it changed settled law under which 'The surety's rights come first as to the funds owing by the owner . . .' See Uniform Laws Annotated, Uniform Commercial Code, Official Draft, Text and Comments, at 773, 777 (1952); Uniform Laws Annotated, Uniform Commercial Code,

We hold that the Uniform Commercial Code does not abrogate, modify, affect or abridge the equitable doctrine of subrogation, and that Argonaut, the surety on the subcontractor's bond, was not required to file under the Code to preserve its priority under the equitable right of subrogation. Mid-Continent Cas. Co. v. First Natl. Bk. & Tr. Co., 531 P2d at 1373, supra. Accordingly, the judgment of the trial court is reversed with direction that the interlocutory order previously entered be vacated, and that summary judgment be entered for Argonaut, the surety, adjudging it to have priority to the funds held by Castle to the extent of its, Argonaut's, payments of suppliers' and laborers' claims for supplies and labor on the construction project under SECO's contract.

*Judgment reversed. Deen, P. J., and Smith, J., concur.*

SUBMITTED NOVEMBER 2, 1976 — DECIDED DECEMBER 3, 1976 — REHEARING DENIED DECEMBER 16, 1976.

---

Changes in Text and Comments, at 25-26 (1953). Since no draft of the UCC has ever contained an express filing requirement for sureties, and since subrogation rights are not 'security interests' within the meaning of Title 9, this rejection of even a partial preemption of subrogation rights is indeed cogent evidence that the filing requirements were not intended to impair the rights of subrogation. [Cits.] White and Summers, *Uniform Commercial Code*, § 22-5 (1972); Coogan *et al., The Outer Fringes of Article 9,* 79 Harv. L. Rev. 229, 230 (1965)." See also In re J. V. Gleason Co., supra, 452 F2d at p. 1224.

To the same effect is U. S. F. & G. Co. v. First State Bank of Salina, supra (Kan.) 494 P2d 1149, holding that subrogation rights are not "security interests" under the UCC, a contractor's surety is not required to file financing statements under the Code to preserve such rights and priorities, and that legal or equitable subrogation arises by operation of law and does not depend upon contract, assignment or agreement. See French Lumber Co. v. Commercial Realty & Finance Co., supra, (Mass.) 195 NE2d 507; Jacobs v. Northeastern Corp., supra (Pa.) 206 A2d 49.

*Mills & Chasteen, Ben B. Mills, Jr., Smith, Currie & Hancock, Aubrey L. Coleman, Jr.,* for appellant.

*Jessee, Ritchie & Duncan, C. James Jessee, Jr., George E. Duncan, Jr., Jay, Garden & Sherrell, Clayton Jay, Jr.,* for appellees.