## 70739. AETNA CASUALTY & SURETY COMPANY et al.
## v. WESTINGHOUSE ELECTRIC COMPANY.
### (337 SE2d 390)

BEASLEY, Judge.

On November 9, 1971, Pennsylvania Power Company (PPC) acting on its own behalf and as agent for the CAPCO Companies (a consortium of power companies) issued an invitation to bid on supplying thirteen station auxiliary transformers for one of their power generating plants. In a formal written proposal dated December 9, Westinghouse Electric Company (Westinghouse) provided its bid, which was accepted by CAPCO on December 17. On January 25, 1972, a formal order for the thirteen transformers was placed.

The transformers were to be used in groups of three, with one spare, for the various power generation units at a power plant located in Shippingsport, Pennsylvania owned and operated by the CAPCO Companies. Six transformers were shipped by Westinghouse to the Shippingsport plant in December, 1973. All thirteen of the transformers were shipped to the plant by the end of 1974. Westinghouse offered an original warranty period of two years from the date of initial operation. An agreement among the parties extended this period by one year.

Within the warranty period, on November 7, 1977, three of the installed transformers exploded and caught fire causing an interruption in power output provided by the plant and damage to connected and adjacent structures at the plant, including bus bars. The damaged property, excluding the transformers themselves, was insured by ten different insurance companies. These insurance companies and CAPCO eventually agreed that the loss sustained in the explosion and fire, exclusive of the damage to the transformers themselves, was $284,034 of which CAPCO had to assume a deductible amount of $100,000. Accordingly, on July 18, 1979, the insurers paid to CAPCO a total of $184,034 and received in return "Subrogation Receipts" from CAPCO totaling the same amount. These subrogation receipts, in pertinent part read: "In consideration of and to the extent of said payment the undersigned hereby subrogates said Insurance Company, to all of the rights, claims and interest which the undersigned may have against any person or corporation liable for the loss mentioned above, and authorizes the said Insurance Company to sue, compromise or settle in the undersigned's name or otherwise all such claims and to execute and sign releases and acquittances and endorse checks or drafts given in settlement of such claims in the name of the undersigned, with the same force and effect as if the undersigned executed or endorsed them. Warranted no settlement has been made by the undersigned with any person or corporation against whom a claim may lie, and no release has been given to anyone responsible for the

loss, and that no such settlement will be made nor release given by the undersigned without the written consent of the said Insurance Company and the undersigned covenants and agrees to cooperate fully with said Insurance Company in the prosecution of such claims, and to procure and furnish all papers and documents necessary in such proceedings and to attend court and testify if the Insurance Company deems such to be necessary but it is understood the undersigned is to be saved harmless from costs in such proceedings." No claim for damage to or replacement of the three transformers involved in the November 7 explosion and fire was ever presented to the insurance companies.

Prior to this 1977 explosion and fire, CAPCO and Westinghouse were negotiating the purchase of six additional transformers to be used at the Shippingsport plant. Terms of this sale had been negotiated and agreed upon during 1975 and a purchase order for the additional transformers had been issued by CAPCO although the transformers had not yet been built or delivered by Westinghouse. Following the November 1977 incident, Westinghouse and CAPCO revised the agreement surrounding these additional transformers by substituting a much strengthened transformer design for the original transformer design. The revised order was dated December 29, 1977.

From the date of the 1977 incident through the beginning of 1978, representatives of Westinghouse and CAPCO investigated the explosion and fire. CAPCO took the position that the failure of the three transformers was caused by manufacturing or design deficiencies, that such deficiencies were covered by the warranty and that Westinghouse should be responsible for the loss. Westinghouse, while acknowledging that the transformer failures occurred within the extended warranty period, took the position that based upon its investigation, the transformers failed because of external system abuses which were not covered by the warranty and therefore it had no responsibility to CAPCO for the losses. Nevertheless, Westinghouse offered a proposal to supply three transformers of the same upgraded design for the price of two and CAPCO accepted the proposal ("first settlement"). Consequently, the three new transformers were shipped to the plant.

On October 15, 1979, three other of the transformers which had been shipped prior to the end of 1974 and which had been installed at the Shippingsport plant precipitated an oil fire which enveloped and seriously damaged bus bar enclosures and other CAPCO property. This time the property damaged was insured by eleven insurance companies some of whom had been insurers of the property involved in the 1977 mishap under a group of insurance policies different from the group of policies which insured the earlier loss. The eventual amount of property damage loss from the second mishap agreed to by

CAPCO and the second group of insurers was $732,299 of which CAPCO assumed a deductible amount of $500,000. As a result, in February 1981, these insurers paid a total of $232,299 to CAPCO, and the insurance companies in return received "Subrogation Receipts" from CAPCO equalling this amount.

After investigation of this second incident, Westinghouse maintained that the second transformer failure was caused by the same external factors as the first and that this time the transformers which failed were outside the warranty period. By letter of January 14, 1980, an officer of PPC demanded that Westinghouse deliver to Ohio Edison[1]/PPC ten additional new upgraded design transformers at no further cost.

Executives from Ohio Edison/PPC and certain Westinghouse officials met on February 25 and reached an agreement as to the respective claims. The terms of that agreement appear in a March 4 confirmation letter from a Westinghouse district manager to a vice president of PPC: "This letter is intended to confirm the agreement reached during our February 25, 1980 meeting with you, Mr. Tschappat, Mr. McWhorter, and Mr. Firestone. Westinghouse has agreed to provide ten (10) transformers at a firm price of $125,000.00 each. This price includes the 'standard warranty' from Westinghouse Selling Policy 48-000 except the duration of the warranty will be three (3) years from the date of shipment. In addition, the price includes the 'special warranty' (out-and-in) as described in Westinghouse Selling Policy 48-000. This price also includes shipment F. O. B. destination. Other terms and conditions will be in accordance with the standard terms of Westinghouse Selling 48-000 dated March 1978. The transformers are to be duplicates of the units supplied on your order M-8416 except for some possible minor differentials that may come about via substitutions for unavailable parts and accessories. The above price represents a considerable concession from the prices previously provided in our quotation letters. *This commercial consideration represents a total settlement of all existing and future claims involving the past failed Mansfield transformers and the seven (7) remaining units which were all acquired on your purchase order A-100, dated January 5, 1972.* Please acknowledge the above agreement by sending us your purchase order for ten (10) transformers at a price of $125,000.00 each so that we can proceed with shipping three (3) units in March of 1980 and the remaining seven (7) units in October of 1980." (Emphasis supplied.)

On February 20, 1981, agents of Westinghouse were served with a copy of the initial version of the present suit which was filed by vari-

---

[1] One of the CAPCO Companies.

ous insurance carriers of CAPCO and by the CAPCO Companies themselves seeking compensation for damages to property other than the transformers sustained in the 1977 mishap. In July, the complaint was amended to add claims for damages arising out of the 1979 explosion and fire. This complaint was again amended in July 1982, to delete all claims being asserted by any of the CAPCO Companies. The only claims which were left pending in the trial court were the subrogation claims of the various insurance companies arising out of the 1977 and 1979 incidents and based upon the liability of Westinghouse under theories of strict liability in tort, negligence, and failure to warn.

It is without dispute that at no time prior to the service of the original complaint in the present suit did any of the plaintiff insurers or their agents give any written notice of subrogation interests of any party to defendant Westinghouse or its agents or employees. Nor as late as February 28, 1984, the date that the parties in this action filed a partial stipulation of fact with the trial court, was any party aware of any evidence which would indicate that Westinghouse was advised by CAPCO or its insurers that any subrogation claim would be asserted against Westinghouse by any of the involved insurers arising out of either the 1977 or the 1979 occurrence. Nor is there any dispute among the parties regarding the authority of those acting on behalf of Westinghouse and those acting on behalf of CAPCO to so represent the interests of CAPCO and Westinghouse in the February 1980 meeting and in the agreement which resulted from such meeting.

Defendant Westinghouse filed a motion for summary judgment claiming that the terms of the agreement as reflected in the confirmation letter of March 4, 1980, represented a settlement and accord and satisfaction which was binding on the plaintiff insurance companies and therefore their subrogation claims were barred as a matter of law.

After hearing, the court found that assuming the first settlement only resolved the transformer replacement issue and did not cover any property damage claims and assuming further that the plaintiff insurers "did acquire subrogation rights against Westinghouse for property damage as a result of their payment to the insured on July 18, 1979, any and all such subrogation rights were waived by the second settlement (February 15, 1980) between [PPC] and Westinghouse." The court further found that there was clear evidence of the parties' intent to settle all claims, both property damage claims and transformer replacement claims that arose from both the first and second explosions and that "[a]s a complete settlement took place between [PPC] and Westinghouse before any insurance proceeds were ever paid to [PPC] as a result of explosion number two (February 3, 1981), no rights existed which could be subrogated and accordingly the Plaintiffs never acquired any subrogation rights involving the sec-

ond explosion. Questions of equity need not be addressed with regard to the second explosion as the letter of March 4, 1980, as a matter of law, states that *all* damages were to be covered by the settlement. If equity comes into play at all, therefore, it would only be with regard to explosion number one and the subsequent settlement. Any such equitable considerations must, in this Court's view, be in favor of the Defendant and against the insurance companies as the insurance companies, by sleeping on their rights and by not notifying Westinghouse of their interests created by the payment of insurance proceeds as a result of explosion number one, did not do equity. The insurance companies, therefore, cannot now be heard to make any 'equitable' claims against Westinghouse . . . As *all* injuries suffered by [PPC] were settled and compromised with the Defendant, the insurance company Plaintiffs cannot now assert any subrogation losses against Westinghouse. . . ." Summary judgment was granted.

The plaintiff insurance companies appealed. Appellants enumerate three errors: one, that the trial court erred in determining as a matter of law that an insurer's right of subrogation can be compromised without the insurer's participation and consent and that such compromise can occur after as well as before the subrogation rights have been acquired by the insurer; two, that the court erred in determining as a matter of law that the insured intended to settle all claims including "uncontemplated" insurance claims arising out of both fires; and three, that the court erred in determining that no questions of fact remained so as to preclude summary judgment in favor of Westinghouse.

1. The parties in this appeal are in agreement that any cause of action set forth in appellants' complaint actually arose in Pennsylvania. That is, it appears that all of the parties are Pennsylvania corporations or claim through Pennsylvania corporations, that the dispute arose out of a business transaction occurring in Pennsylvania and that the mishaps forming the bases of the claims occurred at a power plant located in Pennsylvania. But, as Westinghouse itself submits on appeal, its transaction of business in our state permits suit here. See *Aiken Asphalt Paving Co. v. Winn*, 133 Ga. App. 3, 5, 6 (209 SE2d 700) (1974).

The apparent conflicts of law question in the present case was raised before the trial court in regard to the subject motion for summary judgment, but the issue was not expressly addressed in the court's order granting summary adjudication. Both in the trial court and on appeal, Westinghouse has maintained that in this instance the law of Pennsylvania must be applied to the substantive issues and the law of Georgia applied to the procedural aspects of the case, relying on *Record Truck Line v. Harrison*, 109 Ga. App. 653 (137 SE2d 65) (1964). There it was held that " '[w]hen a tort occurs in another state

and suit is brought on account of it in the courts of this State, the lex loci delicti governs as to all substantive matters, the lex fori as to all matters affecting only the remedy, such as rules of evidence, methods of shifting the burden of proof, and the presumptions arising from given states of facts.' " Id. at 657 (3).

If we were to view the gravamen of this case as any subrogation right stemming from the proper construction of the subject settlement agreement rather than the alleged torts themselves then we would be in the posture of construing a contract. "The rule of *lex loci contractus* controls all substantive matters, such as 'the *nature, construction* and *interpretation* of contracts. [Cits.]' *Cox v. Adams*, 2 Ga. 158, 165 (1847). The rule of '*lex fori*' controls all matters affecting only the remedy, such as rules of evidence, methods of shifting the burden of proof, and the presumptions arising from given states of fact. [Cit.]' *Hill v. Chattanooga R. &c. Co.*, 21 Ga. App. 104 (93 SE 1027) (1917)." *Menendez v. Perishable Distrib.*, 254 Ga. 300, 302 (329 SE2d 149) (1985).

In any event, under Pennsylvania law "[s]ubrogation is an equitable doctrine involving the right of legal substitution and may take place with or without contractual agreement between the parties. It is granted as a means of placing the ultimate burden of a debt upon the one who in good conscience ought to pay it, and is generally applicable when one pays out of his own funds a debt or obligation that is primarily payable from the funds of another." (Citations omitted.) *Dominski v. Garrett*, 276 Pa. Super. 18 (419 A2d 73, 76) (1980). Likewise, our court has recognized that "[s]ubrogation is a legal as well as an equitable right. [Cit.] 'Subrogation is the substitution of another person in the place of the creditor . . . It is of equitable origin . . . and its object is the prevention of injustice. The courts incline rather to extend than restrict the principle. . . .' [Cits.]" *Argonaut Ins. Co. v. C & S Bank of Tifton*, 140 Ga. App. 807, 810 (232 SE2d 135) (1976).

This similarity permits us to agree with the appellant insurers' observation that in this case of consideration of the companies' rights to subrogation "it is not of 'controlling materiality' whether the plaintiff insurance companies' right of subrogation is to be judged under the law of Georgia or the law of Pennsylvania." But more importantly to our determination, neither the appellants nor appellee Westinghouse have provided any evidence that Pennsylvania law or equity is different in any manner from that which we observe and are bound by in this state in regard to the issues involved. Inasmuch as this is so, for the purposes of this appeal the law of Pennsylvania will be presumed to be the same as Georgia law. *Earley v. Earley*, 165 Ga. App. 483, 485 (300 SE2d 814) (1983).

2. We now address the gravamen of this appeal, that is, the ques-

tion of whether or not the agreement entered into between CAPCO and Westinghouse in 1980 effectively bars the plaintiff insurers' rights of subrogation in regard to both the 1977 and the 1979 transformer mishaps.

It is without dispute that no employee or officer of the insurance companies was present at the meeting in February 1980, during which the subject agreement was developed. Nor is there any evidence that anyone present was acting as agent or representative for the companies' interests. As Tschappat, the chief electrical and mechanical engineer for Ohio Edison Company, said in his deposition when questioned about the meaning of the language contained in the confirmation letter as reflecting what transpired at the meeting: ". . . When it says, commercial consideration, that's what we discussed. At no time did either Westinghouse or myself have any conscious thought of any insurance claim. That was not in our minds at all." The fact that one is not a party to an agreement is an important element; there is an absence of consideration regarding one who is a stranger to the agreement. *Brown v. Moseley*, 175 Ga. App. 282 (333 SE2d 162) (1985).

Even assuming that the parties by their agreement intended to settle all claims including those of the insurers, they had no authority to do so. The fact that the parties had stipulated to the trial court that senior CAPCO officials negotiating the agreement were unaware of any limitations in their authority to resolve the entire dispute between CAPCO and Westinghouse would not alter this. Contractually CAPCO had already given away to the insurers all rights, claims and interests they may have had against Westinghouse in regard to the first explosion and fire. In other words, in regard to the 1977 incident, CAPCO had no claim left against Westinghouse, the forebearance of which could be brought to the bargaining table in 1980. As to the fact that the second set of subrogation receipts, i.e., those that reflected the insurers' payment to CAPCO for the 1979 mishap, were executed subsequent to the 1980 agreement, this would alter the validity and viability of the insurers' rights to subrogation for the second mishap because it appears that in the second set of subrogation receipts as in the first, CAPCO warranted to the paying insurance companies that no settlement had been made by them "with any person or corporation against whom a claim may lie." Nor has there been any claim by any party to this appeal that the second subrogation receipts were altered or significantly different in this regard from the first subrogation receipts. CAPCO was contractually warranting to the insurers that they had not compromised possible legal claims against Westinghouse. Moreover, from the standpoint of equity, with regard to both the 1977 and 1979 claims, even if we characterize the subject 1980 agreement to the fullest effect by denominating it a release, "it is axi-

omatic, as a matter of equity, that the signing of a release by an insured, without the insurer's participation and assent, should not operate so as to destroy the latter's right of subrogation. [Cit.]" *Georgia Hwy. Express v. United Parcel Svc.*, 164 Ga. App. 674, 676 (3) (297 SE2d 497) (1982).

Nor do we accept as germane to the issue of the survival of the insurers' subrogation rights, Westinghouse's contention that the insurers' claim acquired through subrogation would be barred as an "impermissible attempt to split the cause of action." What is meant is that the 1980 settlement was a settlement of all damages, both to the transformers themselves as well as to other property damaged by the explosions and fires, and that the insurers are attempting "double recovery" in the sense of again recovering for the "other property damage" for which they had insured CAPCO. But the parties' intention to settle the "other property" damage claims and as a result subsume the subrogation claims would not be dispositive here. The fact remains that the insurance companies were no more than strangers to the agreement and had both contractual and equitable rights which could not be compromised and ultimately defeated without any participation, either expressly or constructively, by them in such negotiation and settlement.

Finally, we cannot accept the trial court's view that the insurers are equitably barred from pursuing their claims against Westinghouse "by sleeping on their rights" in not notifying Westinghouse of their subrogation rights with regard to the 1977 incident. It cannot be said as a matter of law that the insurers had such a duty and if they did, that they breached it.

"Summary judgment is proper when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . .' The movant has the burden of establishing the nonexistence of any genuine issue of fact, and all doubts are to be resolved against him . . . When the movant is the defendant, he must affirmatively negate at least one essential element of the plaintiff's case, and if he does not do so, he is not entitled to summary judgment." Id. at 674 (1). Here, Westinghouse did not meet its burden of showing a contractual or equitable bar to the plaintiff insurers' claims against it and thus it was not entitled to summary judgment.

3. As mentioned previously, the appellants enumerated as error the trial court's determination as a matter of law that CAPCO and Westinghouse intended to settle all claims including insurance claims arising out of both fires. Finding such intent as a matter of law is unsupported by the record. Besides, the intent of the parties to the agreement is not determinative of the propriety of summary adjudica-

tion in favor of Westinghouse under the facts. See Division 2, supra.

4. Last is appellants' general assertion that the trial court erred in determining that Westinghouse was entitled to summary judgment because of the lack of material questions of fact surrounding the substance of the plaintiffs' claims, that is, that Westinghouse was responsible for the damage. Westinghouse rested its argument for summary judgment on the settlement agreement as a bar to the insurers' claims and not upon the lack of merit of the claims of fault. It is apparent that the trial court's ruling was based on the fact of the settlement and also on an equitable bar. The merits were not the basis for the order. Fault was not reached, and thus whether it was disproved in the summary judgment sense, was not determined.

*Judgment reversed. Deen, P. J., and Pope, J., concur.*

DECIDED OCTOBER 22, 1985 —
REHEARING DENIED NOVEMBER 7, 1985 — 

*M. Scott Barksdale, Marvin L. Karp,* for appellants.
*Rush S. Smith, Jr., John E. Hall, Jr.,* for appellee.