AMERICAN STATES INSURANCE
CO., Appellant,

v.

UNITED STATES of America,
et al., Appellees.

Civ. Nos. 3:04–CV–0834–
N, 3:04–CV–0837–N.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 7, 2005.

James W. Hamel, Hilaree A. Casada, Julia F. Pendery, Dallas, TX, for Appellant.

Donna Bice Read, Louise P. Hytken, Charles B. Hendricks, Dallas, TX, for Appellees.

## MEMORANDUM OPINION AND ORDER

GODBEY, District Judge.

Before the Court is Appellant American States Insurance Co.'s ("ASIC") appeal from the Bankruptcy Court's Orders of January 13, 2004 and March 8, 2004. Because the Court determines that the Bankruptcy Court failed to give full effect to *Pearlman v. Reliance* and unduly limited a surety's equitable subrogation right under Texas common law, the Court vacates those orders and finds for ASIC.

### I. BACKGROUND

On August 28, 2000, Debtor SSEM Corp. ("SSEM") entered into a subcontract with Manhattan Construction Co. ("Manhattan") as general contractor in connection with the City of Dallas Convention Center Expansion and Renovation (the "Project"). ASIC, as surety, issued both performance and payment bonds for the Project on behalf of SSEM and for the benefit of Manhattan. SSEM performed some work on the subcontract and then defaulted.

Pursuant to the subcontract, SSEM was to submit payment applications monthly for work done. The subcontract further provided that Manhattan was not required to pay SSEM in the event of default, and could retain 5% of the amounts earned by SSEM. Apparently pursuant to those two provisions, Manhattan withheld approximately $88,631.73 (the "Withheld Balances"). Following SSEM's default, ASIC as surety paid $430,806.66 to complete SSEM's work on the Project.

On April 11, 2003, SSEM filed a voluntary petition for relief under Chapter 11 of

the Bankruptcy Code, which was converted to a Chapter 7 case. One of SSEM's significant creditors was the Internal Revenue Service ("IRS"), which had filed a pre-petition lien against SSEM for unpaid payroll taxes exceeding $500,000. On August 7, 2003, the United States, on behalf of the IRS, filed a motion for relief from automatic stay, claiming that the Withheld Balances were property of the SSEM estate, and that the IRS had a priority claim on the Withheld Balances due to its pre-petition liens. ASIC disagreed with the IRS's motion and filed its own motion for relief from automatic stay on August 12, 2003, arguing that it was entitled to the Withheld Balances under its equitable subrogation rights and that the Withheld Balances were never earned by SSEM and thus never became part of the estate. The Trustee opposed the IRS's motion on the basis that the IRS tax lien may be subordinated to other claims under Section 724 of the Bankruptcy Code.

On January 13, 2004, the Bankruptcy Court entered its thoughtful and scholarly order (the "Order") denying both motions for relief from automatic stay, and ordering that the Withheld Balances be turned over to the Trustee. ASIC timely moved for reconsideration. On March 8, 2004, the Bankruptcy Court issued an order denying the motion for reconsideration, except that it vacated that part of the Order requiring payment of the Withheld Balances to the Trustee. ASIC timely appealed from both of those orders.

▮ This Court has jurisdiction to "hear appeals from final judgments, orders, and decrees from a bankruptcy court." 28 U.S.C. § 158(a)(1). On appeal, this Court applies the same standard of review as a court of appeals would use reviewing a district court ruling. *Id.* § 158(c). "[C]onclusions of law are reviewed *de novo,* findings of fact are reviewed for clear error, and mixed questions of fact and law are reviewed *de novo.*" *In re Nat'l Gypsum Co.,* 208 F.3d 498, 504 (5th Cir.2000) (citation omitted).

## II. THE NATURE OF SSEM'S INTEREST

Before considering ASIC's interests in the Withheld Balances, the Court must briefly consider what basis SSEM had to claim an interest in those balances. ASIC before this Court consistently refers to the balances as unearned, but also indicates the funds were withheld by Manhattan under two contractual provisions. *See* ASIC Brief at 4, 6. Counsel for the Trustee at oral argument below indicated that the Withheld Balances were entirely retainage, and that the debtor had additional claims for earned but unpaid balances not at issue in this appeal. R. 4:322. The Bankruptcy Court's Order stated: "The funds in question were funds retained under the contract between the Debtor and Manhattan Construction Company, the general contractor for the Project." Order at 2 (R. 3:241). The nature of SSEM's interest in the Withheld Balances may have been apparent to all parties and the Bankruptcy Court below, and that may be why the Order does not address that subject in greater detail. *See* R. 4:318 ("THE COURT. The facts are undisputed . . . .") (also reflecting counsel indicating no facts in dispute). Alas, the facts are not so evident to this Court sitting on appeal given the limited appellate record, so the Court must undertake some analysis of the subcontract.

The subcontract was for a face amount of $1,290,000. R. 3:199. SSEM was to make applications for payment monthly for work performed during the month. R. 3:219 (Art. 5.2.1). Subject to a variety of conditions, *id.* (Art. 5.2.2.–7), SSEM would eventually receive payment for each application. Payment for each approved

application, however, was subject to five percent (5%) retainage.[1] R. 3:199. Finally, the subcontract provides: "Notwithstanding any provision of the Subcontract to the contrary, Manhattan is not obligated to make any payment to [SSEM] under the Subcontract if any one or more of the following conditions exists: (a) Subcontractor ... otherwise is in default under the Subcontract or the Contract Documents." R. 3:219 (Art. 5.3.1(a)).

These two contractual provisions for withholding payment are the only provisions cited to the Court by the parties permitting Manhattan to withhold payment from SSEM. The parties do not point the Court to any factual basis in the record on appeal for SSEM's claim to the Withheld Balances, such as evidence that SSEM performed work, submitted payment applications that met the requirements of Article 5.2, and was due payment. The Court will, therefore, assume that the Withheld Balances comprise retainage and earned balances that were unpaid due to SSEM's default, pursuant to Article 5.3.1(a). Because the Court's analysis is the same for both of those categories, the

Court will not dwell further on the distinctions between the two.[2]

Both retainage and earned but unpaid balances involve balances for work actually done by SSEM but for which payment had not become due under the subcontract at the time of SSEM's filing for protection. By having actually performed the work, SSEM appears to have at least an equitable claim to the balances. Moreover, under certain circumstances SSEM could have a valid contractual claim to those balances. For example, if ASIC could have stepped in and completed the subcontract for no more than the unearned balance on the contract, and if SSEM had diligently paid its downstream subcontractors and suppliers, it would have a valid contract claim for the retainage and earned but unpaid balances. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Thus, it would appear that retainage and earned but unpaid balances would become property of SSEM's estate absent any intervening factors.[3]

1. "Retainage" was not otherwise defined or addressed in the subcontract. Black's defines retainage as "A percentage of what a landowner pays a contractor, withheld until the construction has been satisfactorily completed and all mechanic's liens are released or have expired." BLACK'S LAW DICTIONARY 1341 (8th ed.2004).

2. The Court can conceive of analytical frameworks that would treat retainage differently than earned but unpaid balances. In such a case, the Court would be required to remand for the Bankruptcy Court to give more detailed consideration to the nature of SSEM's claim to the Withheld Balances. Because the Court's analysis is the same for both categories, that is unnecessary in this case.

3. As indicated above, ASIC characterizes the Withheld Balances as money that "was never earned by SSEM, was not owed to SSEM under the subcontract ...." *See* ASIC Brief

at 6. The Court understands ASIC's claim to mean simply that the balances were not due and payable to SSEM under the terms of the subcontract, although SSEM had done the work. Characterizing the balances as unearned, however, could be taken as meaning they included that portion of the $1.3 million contract price associated with work the SSEM did not perform before it defaulted, for which SSEM did not submit a payment application, and that ASIC had to complete. The Court does not understand that to be what ASIC is contending. If the Withheld Balances included such truly unearned contractual balances, SSEM would not have *any* legal or equitable claim to such balances. Because that produces the same result the Court reaches, it is not necessary to determine whether any of the Withheld Balances were truly unearned in that sense.

## III. PEARLMAN SURVIVES THE BANKRUPTCY CODE

The Court now turns to *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). That case, decided under the Bankruptcy Act, considered whether a surety or trustee had the right to retainage held by the United States as owner, when the contractor failed to pay suppliers and subcontractors and the surely had to make those payments. The Court initially noted:

> Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors. So here if the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable hen or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt.

*Id.* at 135–36, 83 S.Ct. 232 (footnote omitted). The Court then proceeded to analyze the equitable subrogation rights of a surety under common law, and concluded:

> We therefore hold in accord with the established legal principles stated above that the Government [owner] had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it.

*Id.* at 141–42. *Pearlman* thus holds that a surety's equitable subrogation rights can prevent retainage from becoming part of the bankruptcy estate, at least under the Bankruptcy Act. The next two questions are whether the Bankruptcy Code changes the result of *Pearlman,* and whether the rights of a surety under Texas law are different from the common law rights that drove the result in *Pearlman.*

■ The Bankruptcy Court below attempted to create an intermediate position on *Pearlman,* after noting that "[m]ost courts have held that *Pearlman* survived the enactment of the Bankruptcy Code," Order at 3 (R. 3:242), but that "[s]ome courts have questioned the continued vitality of *Pearlman* after the enactment of the Code because the Code defines property of the estate more broadly than pre-Code law." *Id.* (citations omitted). After considering sections 541(a)(1) and (d) of the Code, the Bankruptcy Court concluded:

> Certainly, then, to the extent that a surety is the "equitable owner" of funds under state law, those funds continue to be excluded from "property of the estate" under the Code. But, property in which a surety has an "equitable lien" or a "prior right" vis-a-vis other creditors of its principal under state law that the Court in *Pearlman* found to be excluded from the estate under the Act would not be excluded from the bankruptcy estate under § 541 of the Bankruptcy Code because a lien claim or priority claim under the Bankruptcy Code is just that—a claim. This is where the Supreme Court's pronouncement in *Pearlman* may have been superseded by the new, expansive definition of "property of

the estate" under the Code Thus, to the extent that a surety cannot claim equitable *ownership* of the property under state law, but merely possesses an equitable *lien claim* or a *priority claim* against the property, the property becomes property of the bankruptcy estate. Likewise, if a surety has ownership of the funds at issue, an IRS lien against the surety's principal would not attach to those funds.

Thus, the resolution of the issue before this Court turns on whether, under Texas law, ASIC actually has an ownership interest in the withheld funds or merely a claim against the funds.

Order at 4 (R. 3:243) (emphasis in original).

This Court agrees with the Bankruptcy Court that the great weight of authority holds that *Pearlman* survives enactment of the Bankruptcy Code. *See, e.g., First Indem. of Am. Ins. Co. v. Modular Structs., Inc. (In re Modular Structs., Inc.)*, 27 F.3d 72, 77–80 (3d Cir.1994); *Caribbean Resort Constr. and Maint., Inc. v. Coco Beach Util. Co. (In re Caribbean Resort Constr. and Maint., Inc.)*, 318 B.R. 241, 249–50 (Bankr.D.P.R.2003) (citing *Modular Structures* ); *Mendelsohn v. Dormitory Auth of State of N.Y. (In re QC Piping Inst., Inc.)*, 225 B.R. 553, 564–71 (Bankr.E.D.N.Y. 1998); J. Michael Frank & Michael E. Evans, *A Defense of Established Landmarks: Claims of Construction Sureties to Contract Funds under Chapter 11*, 25 TORT & INS. L.J. 28 (1989); 2 DANIEL R. COWANS, COWANS BANKR. L. & PRAC. § 12.30, at 587–88 (1989). *But see In re Nemko*, 143 B.R. 980, 985–86 (Bankr. E.D.N.Y.1992).[4] This Court concurs with the clear majority trend and holds that *Pearlman* survives the enactment of the Bankruptcy Code in its entirety, rather

than in the limited form applied in the Order.

Under *Pearlman*, the label placed on the surety's equitable subrogation interest was not important; the outcome did not turn on whether that interest was characterized as a lien or an ownership interest. *See Pearlman*, 371 U.S. at 136, 83 S.Ct. 232 ("if the surety ... was ... either the outright legal or equitable owner of this fund, *or had an equitable lien or prior right to it*, this property interest of the surety never became a part of the bankruptcy estate ....") (emphasis added). The point was that under common law principles of equitable subrogation, the surety's interest prevented the res from becoming property of the bankruptcy estate. Application of that same principle here leads to the same result: ASIC's interest in the Withheld Balances prevents those balances from become part of SSEM's bankruptcy estate. Although this conclusion is sufficient to resolve the appeal, the Court is cognizant that its decision may be only a rest stop on the Order's journey from the Bankruptcy Court to the Fifth Circuit. The Court will, therefore, consider one further issue.

## IV. A SURETY'S EQUITABLE SUBROGATION RIGHT IS NOT A CLAIM

Finally, the Court will address the character of ASIC's interest in the Withheld Balances. The Bankruptcy Court relied upon Section 53.151(b) of the Texas Property Code to determine that ASIC's interest was a claim, rather than an ownership interest. That portion of the Property Code, however, applies only to statutory payment bonds issued in accordance with Chapter 53, sometimes called Hardeman

---

4. The Bankruptcy Court in *Mendelsohn v. DASNY* distinguished *In re Nemko* factually. 225 B.R. at 569.

Act bonds, and not to contractual performance or payment bonds generally.[5] A bond under chapter 53 must be: in a penal sum at least equal to the total of the original contract amount; in favor of the owner; and executed by the original contractor as principal. TEX. PROP. CODE § 53.202. *See generally Laughlin Environ., Inc. v. Premier Towers, L.P.,* 126 S.W.3d 668 (Tex.App.—Houston [14th Dist.] 2004, no pet.). The bonds in this case did not meet those requirements. R. 3:210–11. Nor did they evidence by their terms intent to comply with Chapter 53. *Id.; see* TEX. PROP. CODE § 53.211(a)(2). Accordingly, Section 53.151(b) is inapplicable to ASIC's bonds.

■ Because the statutory basis the Bankruptcy Court used to categorize ASIC's subrogation rights is inapplicable, the Court turns to Texas common law. Texas case law regarding the nature of a surety's equitable subrogation interest indicates that it is *not* simply a claim. In *Interfirst Bank Dallas, N.A. v. U.S. Fid. and Guar. Co.,* 774 S.W.2d 391 (Tex. App.—Dallas 1989, writ den.), the court considered whether a surety's subrogation rights were security interests under Article 9 of the UCC. The Court held they were not a lien:

> Although there is some minor difference of opinion on this legal issue, the majority rule clearly appears to be the one which was sanctioned by Justice Robert Braucher in his definitive analysis of the subject in *Canter v. Schlager,* 358 Mass. 789, 267 N.E.2d 492 (1971). According to Justice Braucher's analysis, a surety's subrogation rights are not security interests within the purview of Article Nine. *Id.* at 494. This being the case,

the promulgation of the UCC and the enactment of its progeny (such as the Texas Business and Commerce Code) do not adversely affect the pre-Code subrogation rights traditionally afforded to sureties. *Id.; see* 2 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 23–6 (3d ed.1988) (surety's subrogation rights not a security interest); *accord National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843, 847 (1st Cir.1969). Further, it necessarily follows from Braucher's analysis that a surety's right to equitable subrogation is not adversely affected by the lack of perfection of lien claimants' rights if the surety is obliged to satisfy all lienable claims of laborers and materialmen, whether perfected or not.

The overwhelming and essentially unanimous post-UCC decisions have held that the interest of a surety, such as USF & G, continues to be superior to the claim of a contract assignee, such as Bank. *Transamerica Ins. Co. v. Barnett Bank,* 540 So.2d 113, 117 (Fla.1989); *Mid–Continent Casualty Co. v. First Nat'l Bank & Trust Co.,* 531 P.2d 1370, 1377 (Okl. 1975); *accord National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843, 849 (1st Cir.1969); *First Alabama Bank v. Hartford Accident & Indem. Co.,* 430 F.Supp. 907, 911 (N.D.Ala. 1977); *Fidelity & Casualty Co. v. Central Bank,* 409 So.2d 788, 790 (Ala.1982); *Alaska State Bank v. General Ins. Co.,* 579 P.2d 1362, 1368 (Alaska 1978); *Argonaut Ins. Co. v. C & S Bank,* 140 Ga.App. 807, 232 S.E.2d 135, 140 (1976); *United States Fidelity & Guar. Co. v. First State Bank,* 208 Kan. 738, 494 P.2d 1149, 1159 (1972); *Finance Co. of Amer-*

---

**5.** "Subcontractors and suppliers are the 'beneficiaries' of a payment bond. By contrast, a performance bond is only for the benefit of the obligee/owner of the construction project. Subcontractors and suppliers generally do not

have the right to seek payment from the performance bond surety if the principal defaults." *Laughlin Environ., Inc. v. Premier Towers, L.P.,* 126 S.W.3d 668, 671 n. 3 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

*ica v. United States Fidelity & Guar. Co.*, 277 Md. 177, 353 A.2d 249, 254 (1976); *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492, 497 (1971); *Travelers Indem. Co. v. Clark*, 254 So.2d 741, 745–46 (Miss.1971); *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49, 55 (1965); *Third Nat'l Bank v. Highlands Ins. Co.*, 603 S.W.2d 730, 734 (Tenn.1980).

*Id.* at 398–99 (footnote omitted). By the same logic, a surety's equitable subrogation interest is not a claim and takes precedence over mere claim interests.

■ Other Texas cases have acknowledged that one purpose of retainage is that "[i]t supplies a salvage fund for the contractor's surety in the event it makes good on defaults for which it is bound." *Corpus Christi Bank and Trust v. Smith*, 525 S.W.2d 501, 505 (Tex.1975). *Accord Economy Forms Corp. v. Williams Bros. Constr. Co.*, 754 S.W.2d 451, 457 (Tex. App.—Houston [14th Dist.] 1988, no writ) ("The fact that these funds were retained by the general contractor rather than the property owner does not change the beneficiary or the purpose. . . . (3) the retainage provides salvage funds for its surety if the surety makes good on defaults for which it is bound; . . . ."). Thus, under Texas law, if a surety's equitable subrogation right is not an ownership right, it is at least closer to ownership than it is to a claim.

■ Accordingly, even if section 541(a)(1) modified the result in *Pearlman* so that any earned portion of the Withheld Balances would enter SSEM's estate if ASIC's interest were only a lien, as the Order held, under Texas common law ASIC's equitable subrogation interest is greater than a lien; ASIC has an equitable ownership interest in the "salvage fund" to the extent of its completion costs. Thus, regardless whether or not *Pearlman* alone is sufficient to keep the Withheld Balances out of SSEM's estate, ASIC is still entitled to the Withheld Balances. Because the Withheld Balances never enter SSEM's estate, the IRS's priority is immaterial.

## CONCLUSION

It is therefore ordered that the Bankruptcy Court's orders of January 14, 2004 and March 9, 2004 are vacated, that ASIC's motion for relief from automatic stay is granted, and that the United States' motion for relief from automatic stay is denied.