In re NEMKO, INC., Debtor.

The CHASE MANHATTAN BANK, N.A., Plaintiffs,

v.

NEMKO, INC., Debtor and Debtor–in–Possession, and United Jersey Bank, Defendants.

Bankruptcy No. 190–11025–260.
Adv. No. 191–1110.

United States Bankruptcy Court,
E.D. New York.

Jan. 15, 1992.

■

Tenzer, Greenblatt, Fallon & Kaplan by Charles E. Simpson, New York City, for debtor.

Lane & Mittendorf by Christopher R. Belmonte, New York City, for United Jersey Bank.

Winston & Stawn by Howard Seife, Heidi Sorvino, New York City, for Chase Manhattan Bank N.A.

**336**

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

This is an adversary proceeding in which the Plaintiff, Chase Manhattan Bank, N.A. ("Chase") seeks a determination of the validity, priority, and extent of the competing liens it and United Jersey Bank ("UJB") possess with respect to the accounts receivable of the Debtor.

This matter comes before this court on the motion of UJB to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R.Civ.P. 12(b)(6), made applicable to bankruptcy proceedings pursuant to Fed. R.Bankr.P. 7012. In the alternative, UJB seeks an order granting it summary judgment dismissing the complaint pursuant to Fed.R.Civ.P. 56, made applicable to bankruptcy proceedings pursuant to Fed. R.Bankr.P. 7056 and for sanctions against Chase pursuant to Fed.R.Civ.P. 11, made applicable to bankruptcy proceedings pursuant to Fed.R.Bankr.P. 9011.

Plaintiff has filed a cross-motion for summary judgment granting it a validly perfected, first priority lien on all of the personal property, including but not limited to, the accounts receivable of the Debtor. After a hearing and for the reasons stated below, UJB's motion for summary judgment is granted.

## FACTS

Nemko, Inc., the debtor and debtor-in-possession, ("Nemko" or the "Debtor") was formed in August, 1984 as a New Jersey corporation. It commenced operations out of the home of its principals, Dino and Anna Catozzo at 164 Konner Avenue, Pine Brook, New Jersey and engaged primarily in the temporary employment agency business, providing engineers and other technical manpower services. Shortly thereafter, the Debtor opened two additional offices in Garden City and Jamaica, New York. Beginning in August, 1985, the Debtor began the business of repairing, remanufacturing, retrofitting, and assembling buses and railway cars under a contract with General Motors Corp.

On April 8, 1986, the Debtor entered into a Revolving Loan and Security Agreement (the "Loan Agreement") with UJB. Pursuant to the Loan Agreement, the Debtor granted UJB a first security interest in, among other things, the Debtor's accounts receivable, inventory, equipment, machinery and general intangibles in exchange for which UJB agreed to lend the Debtor an amount up to 80% of its qualified accounts receivable. UJB perfected its security interest by filing a Uniform Commercial Code ("UCC") financing statement on April 16, 1986, in the Office of the Secretary of State of New Jersey and the Office of the Morris County Clerk. As of the Petition Date, the Debtor is indebted to UJB in the principal sum of $1,895,922.00 plus interest.

The parties agree that at all times prior to August 1, 1986, the Debtor maintained its chief executive offices at 346 Changebridge Road, Pine Brook, Morris County, New Jersey. The Pine Brook offices are located in a two story commercial building owned by the principals of the Debtor, while all the other facilities are leased.

Thereafter, the Debtor's Chief Executive Officer and Chief Operating Officer, Dino Catozzo, entered into negotiations with Tokyu Car Corp. to perform final assembly of the M–4 railway car for the Metro North Railroad. Requiring additional space to complete this work, the Debtor, on August 1, 1986, executed a lease with the Brooklyn Navy Yard, in Brooklyn, New York, for Building No. 296, a three story brick structure consisting of 144,000 square feet, including 40,000 square feet of office space. The lease described the Debtor as "Nemko, Inc., a New Jersey Corp., having an office at 164 Konner Avenue, Pine Brook, New Jersey." Chase asserts that it is from the Brooklyn offices that the Debtor managed its business.

On April 1, 1987, just eight months after leasing space in Brooklyn, the Debtor entered into a second lease with the Brooklyn Navy Yard for an additional 58,900 square feet of plant space in Building No. 664. This lease described the Debtor as "Nem-

ko, Inc., a New Jersey Corporation, having an office at Building No. 296—Brooklyn Navy Yard, Brooklyn, New York." The Debtor converted the buildings to a railcar and bus retrofit center and twenty two offices.

At the same time as the Brooklyn expansion, the Debtor leased a small billing and storage facility and office for Anna Catozzo, the Debtor's President, at 346 Changebridge Road, Pine Brook, New Jersey. This location consists of approximately 2,000 square feet of office and storage space with the basement and second floor apartment rented out to residential users. The Debtor informed UJB of this move, and on May 11, 1987, UJB amended its financing statement to reflect the relocation of the Pine Brook office to 346 Changebridge Road. Shortly after leasing space at the Brooklyn Navy Yard, the Debtor closed the Jamaica and Garden City offices, while continuing to maintain the Pine Brook location.

In a 1988 promotional film, the Debtor held out its Brooklyn facilities as its "headquarters." In the film, Anna Catozzo states, "we started in our home in New Jersey and then moved. . . ." The narrator of the film thereafter describes the Brooklyn Navy Yard location as the Debtor's current principal place of business.

Congruous with the leasing of space in Brooklyn beginning in 1986, revenue generated by the Debtor's New Jersey operations steadily declined. By the end of the 1988 fiscal year, the Debtor's revenue generating work was performed almost entirely at its New York facilities.

In January, 1989, Chase entered into discussions with the Debtor regarding financing for machinery and equipment. Chase alleges that all correspondence with the Debtor was directed to the Debtor's Brooklyn, New York office. In addition, the Debtor provided its Brooklyn address on its application for a business checking account with Chase.

In May, 1989, the Debtor and Chase entered into a security agreement by which Chase would receive a lien on all the Debtor's personal property, including, but not limited to, accounts receivable, equipment, machinery, and inventory. The Debtor executed two promissory notes to Chase, one dated May 11, 1989 in the amount of $300,-000.00 and the other dated May 7, 1989 in the amount of $600,000.00. Chase perfected its security interest in the collateral by filing U.C.C. financing statements in the Morris County clerk's office in New Jersey on June 23, 1989, the Kings County clerk's office in New York on June 5, 1989, the New York Secretary of State's office on July 7, 1989, and the Kings County Register of Deeds and Mortgages on July 7, 1989. Furthermore, at the request of Chase upon making its first advance to the Debtor, UJB subordinated its lien with respect to the Debtor's machinery and equipment, but not with respect to its accounts receivable or other collateral subject to UJB's security interest. In February, 1990, the Debtor restated its obligation to Chase under the original promissory notes and executed two time promissory notes to Chase in the amounts of $600,00.00 and $300,000.00.

On March 19, 1990, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has defaulted on its obligations to Chase pursuant to the promissory notes. As of the Petition Date, the Debtor was indebted to Chase in the principal amount of $900,000.00, plus interest.

Shortly after the commencement of this case, UJB moved this Court on April 27, 1990 for an order prohibiting the Debtor's use of cash collateral, including the proceeds of accounts receivable subject to UJB's lien. At the time, Chase did not take a formal position on the motion.

The Debtor opposed the motion by raising an objection to the validity of UJB's lien, alleging that UJB had failed to perfect its security interest in the Debtor's accounts receivable in that it had not filed a U.C.C. financing statement in New York. The Debtor claimed that as of August 1, 1986, its chief executive offices was the Brooklyn Navy Yard facility, not its offices in Pine Brook, New Jersey, and that a financing statement would have had to be

filed in New York in order to perfect a security interest in accounts receivable pursuant to the New York Uniform Commercial Code (the "N.Y.U.C.C."). The foregoing contentions of the Debtor were combined in an affidavit of one of the Debtor's principals, Dino Catozzo, sworn to on April 19, 1990, stating that its chief executive office was located in Brooklyn, New York.

At the hearing, a stipulation was entered into by the Debtor, UJB, and Chase which permitted the Debtor to use certain cash collateral represented by the proceeds of accounts receivable to enable it to complete its contract with the New York City Transit Authority (the "NYCTA"). By an order of this Court dated July 12, 1990, the Debtor was permitted to use $529,537.00 of the proceeds from the NYCTA contract and $130,000.00 from other sources. The cash collateral order was amended by a stipulation joined in by UJB and Chase, and was so ordered by this Court on December 6, 1990 to allow certain payments to be made to trade creditors of the Debtor.

After review of the trial exhibits and documents assembled by UJB, the Debtor admitted that its objection lacked merit and therefore withdrew its objection to the validity of UJB's lien in open court. Chase, however, alleges that UJB and the Debtor "struck a deal" in which the Debtor would withdraw its objection to UJB's lien.

The Debtor and UJB, by a joint application, moved this Court on February 26, 1991, for an order granting relief from the automatic stay, and for authority for the Debtor to pay UJB the proceeds of an account receivable due to the Debtor from the NYCTA in the approximate amount of $850,000.00. The motion was adjourned *sine die* on July 23, 1991.

On March 11, 1991, Chase commenced an adversary proceeding against the Debtor and UJB, challenging the validity, priority and extent of the lien of UJB with respect to the Debtor's accounts receivable. In addition to interposing an answer, UJB filed a motion to dismiss Chase's complaint, or in the alternative, for summary judgment and sanctions against Chase. In support of its motion, UJB submitted a second affidavit of Dino Catozzo, sworn to on April 11, 1991, which establishes that at all times the Debtor's chief executive office was located at 346 Changebridge Road, Pine Brook, New Jersey.

Chase subsequently filed a memoranda of law in opposition to UJB's motion. At the June 11, 1991 hearing on the UJB motion, this Court deemed a grant of summary judgment premature and discovery began.

On October 18, 1991, Chase filed a cross-motion for summary judgment seeking a determination that it holds a validly perfected, first priority lien on all of the personal property and accounts receivable of the Debtor and that UJB has no valid lien affecting the accounts receivable of the Debtor. In support of its cross-motion, Chase claims that the Debtor relocated its chief executive offices from Pine Brook, New Jersey to Brooklyn, New York in 1986, three years prior to Chase perfecting its lien.

## DISCUSSION

■ As noted above, this dispute, which is the subject of the adversary proceeding before this Court, arose out of the Debtor's need for the use of cash collateral consisting of the proceeds of accounts receivable which were claimed by UJB to be subject to its lien and of which is disputed by Chase. Inasmuch as the accounts receivable are valuable assets of the Debtor, and the issue before this Court concerns itself with the modification of the automatic stay and the determination of the validity, extent, and priority of liens on the Debtor's assets, this Court finds that the matter falls within the Court's "core jurisdiction" pursuant to 28 U.S.C. § 157(b)(2)(G) and (K) and Fed. R.Bankr.P. 7001(2).

Fed.R.Civ.P. 12(b)(6), which, as noted above is applicable to bankruptcy proceedings by Fed.R.Bankr.P. 7012, provides in pertinent part:

> Every defense ... shall be asserted in the responsive pleadings ... except that the following defenses may ... be made by motion:

> . . . . .

(6) failure to state a claim upon which relief can be granted.

. . . . .

If, on a motion asserting the defense numbered (6) ..., matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment....

A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) may be granted "only when it appears with certainty that no set of facts could be proven at trial which would entitle a plaintiff to any relief." *In re O.P.M. Leasing Services, Inc.*, 21 B.R. 986, 991 (Bankr.S.D.N.Y. 1982).

■■■ On a motion to dismiss for failure to state a claim, a court will take the complainant's factual allegations as the truth and draw all inferences in their favor. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989). Therefore, a complaint should not be dismissed merely because the Plaintiff's allegations are not supported by the specific legal theory advanced. Rather, a court is under a duty to examine the complaint to determine if any possible theory for relief exists. 5 C. Wright & A. Miller, *Federal Practice & Procedure:* § 1219 at p. 191 (1990).

■■ Uniform Commercial Code (the "U.C.C.") § 9–103, which governs the proper place of perfection in multiple state transactions has been adopted by both New York and New Jersey, and states in pertinent part:

(a) This subsection applies to accounts ... and general intangibles and to goods which are of a type normally used in more than one jurisdiction....

(b) The law (including the conflict of laws rules) of the jurisdiction in which the debtor is located governs the perfection and the effect of perfection or nonperfection of the security interest.

N.Y.U.C.C.Law § 9–103(3) (McKinney 1991); N.J.Stat.Ann. § 12A:9–103(3) (West 1991). The U.C.C. defines a debtor's location as "his place of business if he has one, at his chief executive office if he has more than one place of business, otherwise at his residence." N.Y.U.C.C.Law § 9–103(3)(d) (McKinney 1991); N.J.Stat.Ann. § 12A:9–103(3)(d) (West 1991). The official comments to U.C.C. § 9–103 of New York and New Jersey describe "chief executive office" as follows:

(c) "Chief executive office" does not mean the place of incorporation; it means the place from which in fact the debtor manages the main part of his business operations. This is the place where persons dealing with the debtor would look for credit information, and is the appropriate place for filing.

Official Comment 5(c), N.Y.U.C.C.Law § 9–103 (McKinney 1991); Official Comment 5(c), N.J.Stat.Ann. § 12A:9–103 (West 1991). Therefore, in order to assert a valid security interest in the Debtor's accounts receivable, UJB must have perfected its lien in the jurisdiction in which the Debtor's chief executive office is located. In its complaint, Chase asserts that since August 1, 1986, the Debtor's chief executive office has been located at Buildings # 296 and # 664 at the Brooklyn Navy Yard, Brooklyn, New York.

However, even if the Debtor's chief executive office had been relocated to the Brooklyn Navy Yard, therefore establishing the proper place of perfection to be New York, the question arises as to whether Chase's actual notice of UJB's lien prevents it from taking priority over UJB.

■■ N.Y.U.C.C. § 9–401(2) provides in pertinent part:

A filing which is made in good faith in an improper place or not in all of the places required by this section is nevertheless effective with regards to any collateral as to which the filing complied with the requirements of this Article and is also effective with regard to collateral covered by the financing statement against any person who has knowledge of the contents of such financing statement.

N.Y.U.C.C.Law § 9–401(2) (McKinney 1991). It appears that Chase was aware of all the information contained in UJB's U.C.C. financing statements with respect to

UJB's lien on the Debtor's assets before it extended credit to the Debtor. The Subordination letter between UJB and Chase, as well as various exhibits submitted by UJB, establishes Chase's knowledge of the contents of UJB's financing statement filed in New Jersey. Therefore, Chase had actual notice of the contents of such financing statement within the meaning of N.Y.U.C.C. § 9–401(2), and thus it cannot successfully defeat an adverse interest on the grounds of improper filing. *In re Davidoff*, 351 F.Supp. 440, 443 (S.D.N.Y.1972); *Matter of Enark Industries*, 86 Misc.2d 985, 987, 383 N.Y.S.2d 796 (App.Term 2d Dep't 1976); Official Comment 5, N.Y.U.C.C.Law § 9–401 (McKinney 1991). In addition, the purpose of filing is to allow subsequent creditors of the Debtor to determine the true status of its affairs. Official Comment 5(a), N.Y.U.C.C.Law § 9–103 (McKinney 1991). Chase had notice of UJB's lien and willingly took a second position as to the Debtor's accounts receivable.

In *In re Davidoff*, 351 F.Supp. 440, involving a dispute as to priority between two lien creditors, the District Court held that the subsequent creditor with knowledge of the earlier creditor's secured position could not prevail simply because the financing statement was improperly filed. The Court reasoned:

> The status of a trustee in bankruptcy as a lien creditor without notice is not involved in this case; rather we have a dispute between two secured creditors to be resolved in accordance with state law, just as if no bankruptcy existed. Dentsply, the prevailing party below, in effect asserts that one may knowingly perfect a security interest in New York even when he knows that two other creditors hold security interests in the same property, so long as he does not learn of the fact of improper filing, or see a copy of that which is filed. This novel theory must be rejected.

*Davidoff*, 351 F.Supp. at 443.

Chase's narrow interpretation of *Davidoff* is misplaced. In *Davidoff*, Judge Brieant employed a broad reading of § 9–401(2). The Court stated:

> [A]ctual notice of an outstanding equity prevents perfecting a security which will become, by correct filing, superior to such outstanding equity. As stated in *Beneficial Finance Co. v. Kurland Cadillac–Olds, Inc.*, 32 A.D.2d 643, 300 N.Y.S.2d 884 (2d Dept.1969), "the purpose of the notice-filing statute is to give protection to a creditor by furnishing to others intending to enter into a transaction with the debtor a starting point for investigation which will result in fair warning concerning the transaction contemplated." Here, the debtor gave [the creditor] all that notice and warning which proper filing could have given.

*Id.* As illustrated by New York Jurisprudence 2d § 9:

> A general principle of the law of notice is that the means of knowledge, coupled with a duty to make inquiry, are equivalent to knowledge itself. In other words, whatever fairly puts a person on inquiry is sufficient notice where the means of knowledge are at hand, and if one omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have ascertained. Stated differently, it is a general rule that where there is a duty to investigate, if one has knowledge of such facts as would lead a fair and prudent person using ordinary thoughtfulness and care, to make further accessible inquiries, and he avoids the inquiry, he is chargeable with the knowledge which by ordinary diligence he would have acquired. Knowledge of facts which, to the mind of a person of ordinary prudence, leads to inquiry, is actual notice, or in other words, is the knowledge which a reasonable investigation would have revealed. Thus, where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge. And proof of circumstances short of actual notice which should put a prudent person on inquiry authorizes the court to infer and find actual notice. But mere want of caution does not amount to notice of what would have been discovered by the use of caution, where there is no element

of knowledge of facts suggesting inquiry.

81 N.Y.Jur.2d, Notice and Notices § 9 (1989).

■ Furthermore, this Court maintains that a liberal interpretation of § 9–401(2) is congruous with New York's desire to promote notions of creditor equality and the standards of equity which embrace the Bankruptcy Code.

Practically the first words out of the mouths of the drafters (1–102(1)) proclaim that the Code "shall be liberally construed and applied to promote its underlying purposes and policies." Also, the Code embraces equitable principles in 1–103. Section 9–401(2) is a "savings clause"—a backward-looking provision that allows the judge to clean up a mess after the fact. Certainty and uniformity are not independent values to be exalted above all others. Certainty and uniformity facilitate the lawyer's efforts to plan a proper course of conduct. No lawyer in his right mind would rely upon 9–401(2) to refrain from filing in an arguably proper location. Thus certainty-centered policy arguments should carry little cargo here. Mistakes are inevitable in a system where the proper location for filing hinges upon such factors as classification of goods, location of the debtor, the proper time to determine status, place of business, and status of the debtor. The draftsmen wisely recognized that, despite their best intentions, pitfalls await the hapless traveller through the UCC. They provided a savings clause in 9–401(2), and judges should construe it in accord with its spirit.

White and Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 23–15 at 950–51 (2d Ed.1980). Similarly, this Court rejects Chase's argument that § 9–401(2) does not apply to out-of-state filings governed by § 9–103. *See Northwest Acceptance Corp. v. McClellan Equipment Co.*, 79 Or.App. 405, 719 P.2d 887 (Ore.Ct.App.1986) (§ 9–401(2) is not restricted to "in-state" filing errors).

Chase's reliance on *In re Reda, Inc.*, 54 B.R. 871 (Bankr.N.D.Ill.1985), is found to be unpersuasive. While *Reda* did discuss § 9–401(2), it is easily distinguished. In *Reda*, the Court held that a second secured party's knowledge of a first secured party's prior interest did not prevent the second secured party's junior interest from assuming priority after the first secured party's interest lapsed. *Id.*, at 878. However, *Reda* addressed a financing statement that lapsed because of the passing of time, not because the Debtor allegedly changed the location of its principal place of business. *Id.* The Court reasoned that "[t]he continuation statement lets other parties know that the secured party's security interest is to extend beyond the five year period." *Id.*

In the case before this Court, however, UJB's financing statement has not lapsed due to the passing of the statutory period. Pursuant to both N.Y.U.C.C. § 9–403(2) and N.J.Stat.Ann. § 12A:9–403(2):

Except as provided in subsection (6) a filed financing statement is effective for a period of five years from the date of filing. The effectiveness of a filed financing statement lapses on the expiration of the five year period unless a continuation statement is filed prior to the lapse.

N.Y.U.C.C.Law § 9–403(2) (McKinney 1991); N.J.Stat.Ann. § 12A:9–403(2) (West 1991). UJB filed financing statements with the Secretary of State of New Jersey and the Morris County Clerk in April, 1986. Subsequently, in 1987, UJB amended its financing statements to reflect the Debtor's relocation to 346 Changebridge Road, Pine Brook, New Jersey. Neither as of March 19, 1990, the date the petition for relief was filed, nor at the time of the commencement of this adversary proceeding, had the five year statutory period lapsed. Therefore, § 9–403(2) and the Court's analysis in *Reda* are inapplicable to the present case.

## CONCLUSIONS

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(G) and (K) as it is a core proceeding concerning the modification of

the automatic stay and the determination of the validity, extent, and priority of liens on the accounts receivable of the Debtor.

2. UJB's motion to dismiss Chase's complaint pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Bankr.P. 7012 is granted.

3. Chase's cross-motion for summary judgment seeking a determination that it holds a validly perfected, first priority lien on all of the personal property and accounts receivable of the Debtor and that UJB has no valid lien affecting the accounts receivable of the Debtor is denied.

SUBMIT AN ORDER CONSISTENT WITH THIS OPINION.