**In re NEMKO, INC., Debtor.**

**Bankruptcy No. 190–11025–260.**

United States Bankruptcy Court,
E.D. New York.

Aug. 25, 1992.

Tenzer, Greenblatt, Fallon & Kaplan by Charles Simpson, New York City, for debtor.

Lane & Mittendorf by Christopher Belmonte, Thomas R. Califano, New York City, for United Jersey Bank.

Winston & Strawn by Howard Seife, New York City, for Chase Manhattan Bank, N.A.

Kronish, Lieb, Weiner and Hellman by Richard Lieb, New York City, Albert C. Cosenza, Brooklyn, N.Y., Co-attorneys for New York Transit Authority.

Jacques Catafago, New York City, for Excel Industries.

Fox, Bennet and Turner by Charles D. Bock, New York City, for Transportation Mfg. Corp.

## DECISION ON AN ORDER TO SHOW CAUSE SEEKING TO MODIFY THE ORDER OF THIS COURT OF JULY 12, 1990, ALLOWING THE USE OF CASH COLLATERAL

CONRAD B. DUBERSTEIN, Chief Judge.

This matter comes before this Court on an Order to Show Cause and a joint application by the Debtor and United Jersey Bank (the "Joint Application") for an order modifying an order of this Court dated July 12, 1990, allowing the use of cash collateral. After hearings and for the reasons stated below, the Joint Application is granted in part and denied in part. The cross-motion of Excel Industries, Inc. and the motion of Transportation Manufacturing Corp. are denied.

### FACTS

Nemko, Inc., the debtor and debtor-in-possession (the "Debtor"), was incorporated in 1984 in New Jersey and functioned as a temporary employment agency for engineers and other technical employees. It began operations out of the Pine Brook, New Jersey home of its principals, Dino and Anna Catozzo and later expanded to other offices. Beginning in August 1985, the Debtor commenced the business of refurbishing and assembling buses and railway cars under a contract with General Motors.

In April 1986, the Debtor entered into a revolving loan and security agreement with United Jersey Bank ("UJB"). Under the agreement, the Debtor granted UJB a first security interest in, among other things, its accounts receivable, inventory, equipment, machinery, and general intangibles. UJB perfected its security interest by filing UCC financing statements in New Jersey.

Thereafter, Dino Catozzo, entered into negotiations with Toky-u Car Corp. to perform final assembly of the M-4 railway car for the Metro North Railroad. Requiring additional space to complete this work, the Debtor, on August 1, 1986, executed a lease with the Brooklyn Navy Yard, in Brooklyn, New York, for Building No. 296,

a three story brick structure consisting of 144,000 square feet, including 40,000 square feet of office space.

In April 1987, the Debtor expanded its Navy Yard operation to an additional 58,-900 sq. ft. space. During this time, the Debtor closed the offices which housed its employment agency operations.

In early 1989, the Debtor entered a contract (the "Contract") with the New York City Transit Authority ("NYCTA"), contract number 7DG1175, which called for the Debtor to overhaul seventy-five buses with an option to overhaul an additional twenty-five. The option was subsequently exercised by NYCTA. Under the Contract, the Debtor hired several subcontractors, including Excel Industries, Inc. ("Excel"), which provided bus windows, and Transportation Manufacturing Corporation, Inc. ("TMC"), which provided paints, parts and services.

Shortly thereafter, the Debtor entered into discussions with Chase Manhattan Bank, N.A. ("Chase") regarding financing for machinery and equipment. In May, 1989, the Debtor entered into a security agreement with Chase. Under this agreement, the Debtor granted Chase a lien on all of the Debtor's personal property including, but not limited to, accounts receivable, equipment, machinery, and inventory. At the request of Chase upon making its first advance to the Debtor, UJB issued a letter granting Chase a priority security interest in only the Debtor's machinery and equipment. Chase perfected its security interest by filing UCC financing statements in both New York and New Jersey.

On March 19, 1990, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. As of the petition date, the Debtor was indebted to UJB in the principal amount of $1,895,922 plus interest and to Chase in the principal amount of $900,000 plus interest.

On April 27, 1990, UJB moved this Court for an order prohibiting the Debtor's use of cash collateral, including the proceeds of accounts receivable subject to UJB's lien. Both the Debtor and Chase objected to this motion, disputing the validity of UJB's lien.

At the hearing on the cash collateral motion, a stipulation was entered into by the Debtor, UJB and Chase which permitted the Debtor to use certain cash collateral represented by the proceeds of accounts receivable to enable it to complete the Contract with NYCTA. By an order of this Court dated July 12, 1990, the Debtor was permitted to use $529,537 of the proceeds from NYCTA contract and $130,000 from other sources. The cash collateral order was amended by a stipulation which was joined in by UJB and Chase, and was so ordered by this Court on December 6, 1990 to allow payments to be made to certain creditors of the Debtor.

On February 26, 1991, the Debtor and UJB moved this Court by Order to Show Cause and Joint Application to modify the July 12, 1990 cash collateral order to allow all remaining monies owed by NYCTA to be paid to the Debtor free and clear of any claims against NYCTA. These payments would then be turned over to UJB in partial satisfaction of UJB's secured claim. In addition, the application requested that the Debtor be permitted to use up to $10,000 of the cash collateral to pay an accountant to appropriately invoice NYCTA for extra work done on the Contract.

Chase objected to the Joint Application claiming that it should be paid the proceeds of the account receivable. Chase argued that its lien on the accounts receivable had priority on the ground that UJB's lien had never been properly perfected. NYCTA also objected since it might be subject to dual liability if it were forced to pay out the money before various subcontractors claims were resolved by virtue of provisions of the contract as is hereinafter more particularly discussed.

On March 11, 1991, during the course of hearings on this matter, Chase commenced an adversary proceeding in this Court to determine the priority of the security interest in the accounts receivable. Chase argued that UJB failed to perfect its security interest since UJB never filed UCC financing statements at the Debtor's principal place of business, Brooklyn, New York. The Joint Application to modify the cash

collateral order of July 12, 1990 was adjourned *sine die* shortly after the adversary proceeding was initiated.

This Court, in a decision dated January 15, 1992 and reported as *In re Nemko, Inc.*, 136 B.R. 334 (Bankr.E.D.N.Y.1992), rejected Chase's argument, and held that, regardless of the alleged inadequacy of UJB's UCC filings, Chase had actual notice of UJB's primary security interest as evinced by Chase's request for the subordination letter, *Id.* at 339–40. Chase has appealed this decision to the District Court where it is still pending. Chase has not sought a stay of the judgment pending appeal.

In the adversary proceeding, UJB also filed a motion pursuant to Fed.R.Bankr.P. 9011 to impose sanctions against Chase. This Court denied the motion in a decision dated January 31, 1992 and reported as *In re Nemko, Inc.*, 136 B.R. 342 (Bankr. E.D.N.Y.1992).

Subsequent to the aforesaid decisions, the hearing on the Joint Application, which had been adjourned *sine die,* was reinstated. At such time NYCTA, Chase, and two of the Debtor's subcontractors, Excel and TMC, objected to the Joint Application. The Debtor owes Excel in excess of $329,-000 and TMC in excess of $1,000,000 under the Contract.

Excel and TMC assert that language in the Contract requires NYCTA to withhold the sums due them from its payments to the Debtor. They claim this money should be paid directly to them and is, therefore, not part of the Debtor's receivables and not subject to the banks' liens. The clauses of the Contract on which Excel and TMC base their claims are as follows:

ARTICLE 9 INVOICES AND PAYMENTS

.     .     .     .     .

D. A condition precedent to payment shall be the following:

.     .     .     .     .

2. The Contractor establishes, to the satisfaction of the Authority, that its subcontractors and suppliers have been paid for the Work performed and materials furnished by each of them which Work and materials were encompassed by previous payments to the Contractor.

.     .     .     .     .

ARTICLE 11 WITHHOLDING MONEY DUE CONTRACTOR TO MEET CLAIMS

If at any time a claim, lien or judgment shall be made by any person or corporation against the Contractor, or the Authority, for which Contractor is liable under this Contract or with respect to matters pertaining to the Work of this Contract or otherwise by law, the amount of such claim or so much thereof as may be deemed by the Authority to be reasonable shall be retained by the Authority, in addition to the other sums herein authorized by the Contract to be so retained, out of any moneys then due or thereafter becoming due to the Contractor hereunder as security for the payment of such claim. If the liability of any such party on such claim or claims shall have been finally adjudicated by a judgment of a court of competent jurisdiction or such claim or claims shall have been admitted by the Contractor to be valid, then the claim may be paid from the amount so retained hereunder, credited against the payments due Contractor, and the balance, if any, paid to the Contractor.

NYCTA asserts that by drafting the Contract in this manner, it never intended to give subcontractors the right to a direct action against NYCTA. Rather, it merely sought to protect itself from having to pay both the money owed to the contractor and claims made by third parties, including subcontractors.

On February 14, 1991, subsequent to the initiation of this bankruptcy case, Excel brought a suit against NYCTA in the United States District Court for this District, claiming that NYCTA should pay them the money owed on the subcontract, a total of $329,671. This suit is now pending before the Honorable Eugene H. Nickerson. Excel objects to NYCTA transferring any mo-

nies to the Debtor until Excel's right to the funds have been determined.

On July 30, 1991, TMC instituted a similar suit against NYCTA in the District Court claiming that it was owed over $1,000,000. However, the suit was settled with prejudice on May 7, 1991, as part of an agreement with NYCTA which included matters outside the Contract.

NYCTA has calculated the balance due the Debtor under the Contract as follows:

| | |
|---|---:|
| Total remaining under the contract: | $823,227 |
| Less liquidated damages, credit for work not required, prompt payment discounts materials provided, and warranty claims | (108,911) |
| Plus extra work on last six buses | 38,958 |
| Less due NYCTA from remaining contingency funds | (14,645) |
| Net balance due the Debtor | $738,629 |

NYCTA has deposited the net balance of $738,629 into an interest bearing custodial account and is willing to turn this sum over to whomever this Court so orders, provided it can be protected from liability for any additional claims to the funds. *See* Sur-Reply of New York City Transit Authority at 6. The Debtor disputes the $108,911 withheld by NYCTA for liquidated damages, etc.

The Debtor and UJB, in their Joint Application, request that this Court order that all remaining monies owed by NYCTA to the Debtor be turned over to the Debtor free and clear of any competing claims. In response, Excel and TMC, the Debtor's subcontractors, assert that the money is not property of the estate and should not be turned over to the Debtor. In addition, Excel has made a cross-motion requesting that NYCTA be compelled to pay Excel the money owed Excel by the Debtor. Similarly, TMC has made a motion requesting that it also be directly paid by NYCTA.

The Debtor and UJB further requested that the money received from NYCTA be turned over to UJB in partial satisfaction of its secured claim less $10,000 to be used to pay an accountant for the preparation of invoices to NYCTA for additional work performed. Chase objects to the payment of the monies to the Debtor, UJB or the accountant.

## DISCUSSION

### I. *Property of the Estate*

■ Section 541(a) of the Bankruptcy Code defines property of the estate as "all legal or equitable interests of the debtor." [1] This definition of property has been given "the broadest possible interpretation" and includes an interest that is strictly contingent. *In re Brown*, 734 F.2d 119, 123 (2d Cir.1984).

■ An admitted liability owed to a debtor under a contract is property of the estate, even though the debtor's subcontractors may have claims against parties to the contract. *In re J.F. Naylor and Co.* 67 B.R. 184, 189, *modified*, 67 B.R. 192 (Bankr.M.D.La.1986); *see Georgia Pacific Corp. v. Sigma Service Corp.*, 712 F.2d 962 (5th Cir.1983). In *In re J.F. Naylor and Co.* the debtor was a subcontractor whose suppliers made claims against the

---

1. 11 U.S.C. § 541(a) provides, in pertinent part:
    (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
    (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

    . . .
    (6) Proceeds, product, offspring, rents, and/or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.
    (7) Any interest in property that the estate acquires after the commencement of the case.

general contractor and the property owner. 67 B.R. at 186. The Bankruptcy Court held that the entire amount owed to the debtor by the general contractor was property of the estate, notwithstanding the suppliers' claims. *Id.* at 189.

■ NYCTA admits that it owes the Debtor a minimum of $738,629 for work completed pursuant to the contract. *See supra* pp. 984–85. The Debtor has an equitable interest in these funds and therefore they are property of the estate.

Excel and TMC base their argument that the monies owed are not property of the estate on the Supreme Court decision in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). In *Pearlman,* the U.S. government withheld a percentage from its progress payments on a construction contract, with a total of $87,737 retained in a fund for payment upon satisfactory completion of the job. The contractor defaulted on the contract and filed a petition in bankruptcy. The government was forced to hire another contractor to complete the job, and the original contractor's surety paid over $350,-000 to subcontractors and materialmen under its payment bond. *Id.* at 134, 83 S.Ct. at 233. The Supreme Court followed the common law rule of subrogation which gave the surety a right to be reimbursed from the retained fund, *Id.* at 136–137, 83 S.Ct. at 235, and held that since the surety had a property interest in the fund, the monies did not pass to the debtor's trustee under the Bankruptcy Act. *Id.* at 141, 83 S.Ct. at 237.

■ The Supreme Court decided the *Pearlman* case pursuant to the old Bankruptcy Act which defined the property passing to the bankrupt's[2] trustee in a more limited fashion than the Bankruptcy Code currently defines the property of the debtor's estate.[3] Under the broad definition of property in Section 541(a) of the Bankruptcy Code, the Debtor's interest in the account receivable is property of the estate.

In addition, the Court's decision in *Pearlman* was based on the common law equitable principle of subrogation and the rights of a surety. *Id.* at 136–137, 83 S.Ct. at 235. The case before this Court, however, does not pertain to the equitable rights accorded to a surety under subrogation, but to the rights of a subcontractor to receivables due to a debtor-general contractor. Therefore, this Court does not find the reasoning in *Pearlman* to be persuasive in the present case.

Furthermore, the monies retained by the government in *Pearlman* were placed in a fund prior to the bankruptcy proceedings for the specific purpose of assuring proper completion of the contract. *Id.* at 133–134, 83 S.Ct. at 233. In addition, other cases cited by Excel and TMC discuss funds which were set up prior to the filing of bankruptcy petitions.[4] However, the present case can be distinguished from those cases inasmuch as the issue before this Court does not involve a pre-petition fund, but a contractual right to withhold a portion of a debtor's account receivable.

The Debtor has a valid account receivable from NYCTA which is property of the estate notwithstanding any contractual

**2.** § 1 of the Bankruptcy Act defined a person who has filed a voluntary petition as a "Bankrupt."

**3.** *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 202–208, 103 S.Ct. 2309, 2312–15, 76 L.Ed.2d 515 (1983) (interpreting Bankruptcy Code § 541 to include a broader range of property in the estate than the old Bankruptcy Act). *Compare* 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case.") *and Whiting Pools,* 462 U.S. at 204, 103 S.Ct. at 2313 ("Congress intended a broad range of property to be included in the estate") *with Pearlman,* 371 U.S. at 135, 83 S.Ct. at 234.

("Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee.").

**4.** *E.g. In re N.S. Garrott & Sons,* 772 F.2d 462 (8th Cir.1985); *Creative Data Forms, Inc. v. Pennsylvania Minority Business Dev. Auth.,* 72 B.R. 619 (E.D.Pa.1985); *In re All Chemical Isotope Enrichment, Inc.,* 127 B.R. 829 (Bankr. E.D.Tenn.1991); *In re Cedar Rapids Meats, Inc.,* 121 B.R. 562 (Bankr.N.D.Iowa 1990).

right that NYCTA has to delay payment while it has a claim pending against it.

## II. Debtor's Right to Payment by NYCTA

■■■ The Debtor and NYCTA agree that, at a minimum, $738,629 is due under the contract for work performed by the Debtor. *See supra* p. 985. This account receivable is property of the estate. However, the Debtor does not have an immediate right to full payment. Even though $738,629 is due the Debtor, none of the parties dispute that, except as specifically provided for in the contract, the express terms of Article 11 of the Contract give NYCTA a right to withhold payment as security for claims asserted in connection with work performed pursuant to the Contract.

· This contractual right is not affected by the filing of a Chapter 11 petition. The rights of a debtor to the property of the estate do not expand when the debtor files a petition in bankruptcy. *In re Brown*, 734 F.2d 119, 124 (2d Cir.1984); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984). NYCTA may not be compelled to pay any monies which it has rightfully withheld pursuant to the terms of the Contract. Although section 542(b) of the Bankruptcy Code provides that a debt which is matured or payable on demand shall be turned over to the estate,[5] the Bankruptcy Code does not require the turnover of a debt which is not fully matured. *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir.1990). The filing of a petition in bankruptcy does not confer upon the Debtor a right to be paid sooner than it would under the terms of the Contract.

Article 11 of the Contract permits NYCTA to withhold money if a claim relating to the contract is made against it. Excel has made such a claim by filing its suit against NYCTA in the District Court. Pursuant to the terms of Article 11, NYCTA may retain a reasonable amount to protect itself from liability on this claim. Therefore, NYCTA may withhold from the Debtor the $329,671 which Excel claims it should be paid, subject to the decision of the District Court wherein its action is pending and further subject to a determination by this court whether or not the payment of such claim is permissible by the Bankruptcy Code as is hereinafter further discussed.

TMC also asserts that NYCTA should withhold monies to satisfy the more than $1,000,000 owed to it by the Debtor.

■■■ Although TMC argues that Article 9 of the Contract requires NYCTA to pay the subcontractors before paying the Debtor, the language of that article clearly reflects that this is not so required. All that Article 9 provides for is that NYCTA be satisfied that the subcontractors have been paid as a condition precedent to the payment to the Debtor. NYCTA may unilaterally waive the condition precedent to such payment. A condition in a contract may be waived when that condition is solely for the benefit of the party waiving it. *See* John D. Calamari & Joseph M. Perillo, The Law of Contracts 494 (3d ed. 1987). The condition in Article 9 is solely for the benefit of NYCTA since its purpose is to allow NYCTA to protect itself from claims of subcontractors who have not been paid. NYCTA has indicated that it will make payment to any party it is directed to by this Court and has therefore waived the condition in Article 9.

■■■ The only claims TMC and Excel have against the Debtor are those of unsecured creditors in this Chapter 11 proceeding. Inasmuch as the Debtor's account receivable from NYCTA is encumbered by the lien of UJB and the junior lien of Chase, TMC may be paid only after these secured creditors are satisfied if there are sufficient funds in the estate. "[T]here is no ... applicable provision in the Bankruptcy Code authorizing the debtor to pay cer-

---

**5.** 11 U.S.C. § 542(b) provides:

(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

tain pre-petition unsecured claims in full while others remain unpaid. To do so would impermissibly violate the priority scheme of the Bankruptcy Code" *In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1496 (11th Cir.1992) (quoting *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1094 (9th Cir. 1991)).[6]

Section 542(b) of the Bankruptcy Code requires all matured debts to be turned over to the debtor-in-possession in a Chapter 11 proceeding. In the present case, NYCTA owes the Debtor a minimum of $738,629. That sum, less $329,671 claimed to be due Excel, should be turned over to the Debtor subject to the rights of UJB in and to the same as hereinafter discussed, and free and clear of any claims of any subcontractors, including, but not limited to, TMC, as provided for by the contract. The $329,671 shall be held by NYCTA pending the determination of Excel's right to the said sum.

### III.  Debtor's Payment of Secured Creditors

■■■ Both UJB and Chase have security interests in the Debtor's accounts receivable. This Court, in a decision dated January 15, 1992 and reported at 136 B.R. 334, found that UJB has a priority lien on the accounts receivable. Although Chase has appealed this decision and requests that this Court refrain from ordering any monies to be turned over to UJB until the appeal is settled, Chase has not had the

decision stayed pending appeal. Accordingly, this Court does not find that the withholding of its decision as to the Joint Application pending a determination of the appeal is warranted.

In addition, Chase claims that at least $60,000 of the Debtor's inventory, upon which Chase asserts that it has a first lien, was used by the Debtor to complete the Contract. Therefore, it claims entitlement to that sum from the moneys due the Debtor by the NYCTA on the grounds that said moneys represent accounts receivable generated from the Debtor's use of the inventory. However, in light of the fact that this Court has held that UJB has a prior lien on all of the Debtor's accounts receivable, Chase's claim cannot be sustained, irrespective of whether or not it has a lien on inventory.

### IV.  Debtor's Payment of Accountant's Fees

The Debtor and UJB, in their Joint Application, request that $10,000 of the funds to be received from NYCTA be used to pay accountants for their services in preparing invoices to NYCTA. Chase objects to this request.

■■■ Section 363(c)(2) of the Bankruptcy Code provides that cash collateral may be used only with the consent of all of the lienholders or by order of the court.[7] Where a primary secured creditor consents to the use of cash collateral but a secondary secured creditor objects, a debtor may

**6.** In a footnote to its reply memorandum, TMC asserts that, even if all of its other arguments as to why it should be paid directly were to fail, equity would require that the funds be considered in a constructive trust for its benefit. In a bankruptcy proceeding, state law controls whether or not such a trust is formed. *Georgia Pacific Corp. v. Sigma Service Corp.*, 712 F.2d 962, 969 (5th Cir.1983).

TMC cites four factors considered by New York State courts to determine if a constructive trust should be formed: a confidential or fiduciary relationship, a promise, a transfer in reliance on that promise, and unjust enrichment. In the present case, TMC has failed to show that any of these four factors are present. The Attachment to the Contract, which TMC cites as evidence of a fiduciary relationship, is merely a guarantee agreement and is no evidence of a relationship of special confidence or trust. The language which TMC cites as a promise, the

condition precedent in Article 9 of the contract, is a condition of payment waivable by the NYCTA and not a promise made to TMC. TMC indicates that it relied on the alleged promise in a brief conclusory statement but does not present any evidence which might support its assertion. Finally, TMC's conclusion that unjust enrichment results from a Chapter 11 debtor having received but not yet paid for pre-petition goods and services overlooks the most basic principles of the law of bankruptcy reorganization.

**7.** 11 U.S.C. § 363(c)(2) provides:
  (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
    (A) each entity that has an interest in such cash collateral consents; or
    (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

only use the collateral by an order of the court. *See In re Trenge,* 127 B.R. 552, 555 (E.D.Pa.1991). Though UJB, which has the primary security interest in the Debtor's accounts receivable, consents to the use of the cash collateral, Chase, which has a secondary security interest, objects to its use. Accordingly, this Court must determine whether the accounting fees are, as the Debtor and UJB argue, reasonable and necessary costs of preserving the secured claim, as required by section 506(c) of the Bankruptcy Code.[8] The Debtor must prove that the "funds were expended primarily for the benefit of the creditor and that the creditor directly benefited from that expenditure." *In re Flagstaff Foodservice Corp.,* 762 F.2d 10, 12 (2d Cir.1985). The Debtor has not introduced evidence showing specifically how the work performed by the accountants has benefited the secured creditors. Therefore, the Debtor must set down a hearing to determine the extent to which the accounting fees were reasonable and necessary to preserve the secured claim.

## CONCLUSIONS

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(E) as it is a core proceeding concerning an order to turn over property of the estate.

2. The Debtor and UJB's Joint Application is granted in part and denied in part as follows:

    a. The $738,629 admittedly owed by NYCTA to the Debtor, plus the interest accrued thereon, is property of the estate.

    b. NYCTA may withhold up to the $329,671 claimed to be due Excel pending the determination of Excel's rights to said sum.

    c. NYCTA shall turn over to the Debtor a minimum of $408,958, plus interest.

    d. The Debtor shall pay to UJB the monies received from NYCTA, less the sum of $10,000, which sum shall be held by it subject to the further orders of this Court after a hearing to determine the entitlement by the accountant to any fee and the extent of the same. Any surplus remaining over and above the amount fixed by this Court to be paid to the accountant, not to exceed $10,000, shall be paid by the Debtor to UJB.

    e. The Debtor is directed to schedule a hearing to determine the entitlement by the accountant to any fee and the extent of the same.

3. Excel's cross-motion to compel NYCTA to pay the monies owed by the Debtor is denied.

4. TMC's motion to compel NYCTA to pay the monies owed by the Debtor is denied.

SETTLE AN ORDER CONSISTENT WITH THIS OPINION.

---

**8.** 11 U.S.C. § 506(c) provides:

    (c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Section 1107 of the Bankruptcy Code provides that the debtor-in-possession in a chapter 11 case has the rights and powers of the trustee.